**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | |
| ALLEN NEAL | |
| Appellant | No. 2462 EDA 2016 |

Appeal from the Judgment of Sentence dated July 11, 2016
In the Court of Common Pleas of Monroe County
Criminal Division at No(s): CP-45-CR-0000225-2015

BEFORE: LAZARUS, J., SOLANO, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY SOLANO, J.:                    **FILED SEPTEMBER 11, 2017**

Appellant Allen Neal appeals from the judgment of sentence imposed after he was convicted of two counts of indecent assault.[1] We affirm in part, vacate in part, and remand for imposition of a twenty-five year registration requirement under the Sex Offender Registration and Notification Act, 42 Pa.C.S. §§ 9799.10–9799.41 (SORNA).

The trial court set forth the facts of this case as follows:

> [Appellant] and the victim, Karina Zelaya-Betancourt, had been best friends for approximately six or seven years prior to this incident, which occurred in the early morning hours on December 14, 2014. Following a night out, [Appellant], the victim, and several friends went to the victim's apartment to

_____

[*] Former Justice specially assigned to the Superior Court.

[1] 18 Pa.C.S. §§ 3126(a)(1) (without complainant's consent) and (a)(4) (unconscious complainant).

continue the party. As the party died down, most of the guests left until only [Appellant], the victim, and the victim's friend, Amanda Belen, remained. The victim went to sleep in her daughter's bedroom[2] because Ms. Belen had already gone to sleep in her room. [Appellant], after checking in on the victim, went to sleep on the living room couch.

At approximately 8:00 a.m., the victim was awoken by a "pain anally and I saw [Appellant] over me and I just told him to get off of me." She testified that she had been sleeping on her stomach and that her pajama pants and underwear had been pulled down. [Appellant] was mostly clothed but the victim "saw him like tuck himself back in before he got off of me" and "walked to the living room." On cross-examination, the victim conceded that she did not actually see [Appellant]'s penis.

Following the assault, the victim felt wetness on her buttocks area. She went into the bathroom, wiped the area with baby wipes, and discovered that she was bleeding from her anus. Some of the bloody wipes were flushed down the toilet, but several others were thrown into the trashcan. . . .

After wiping herself off, the victim went into her bedroom, where Amanda Belen had been sleeping until she was awoken after hearing the victim yell at [Appellant]. The victim then called another friend, who lived close by and had been present the night before, to escort [Appellant] out of the apartment. [Appellant] complied without incident.

Subsequently, the victim was taken to Pocono Medical Center and the police were called. At the hospital, the victim was examined by Rose Reyes, R.N., a Sexual Assault Nurse Examiner (SANE). During the examination, the victim provided a statement to Nurse Reyes and Detective Robert Miller of the Pocono Mountain Regional Police Department (PMRPD).

Nurse Reyes, who qualified as an expert SANE nurse, testified that, at the beginning of the examination, the victim was crying and recounted the facts summarized above. During the interview portion of the examination, the victim completed a

---

[2] The victim's daughter was not in the apartment that night.

questionnaire, which asked various questions, including one central to this appeal: whether the victim had consensual sex in the previous five days. On the questionnaire, the victim responded that she had not. . . .

During her physical examination of the victim, Nurse Reyes discovered "tearing in the anal area. It was mostly toward the 5 and 8 o'clock area. There was tiny little skin tears with a little tiny bit of bleeding more so to the 5:00 and 6:00 area." Nurse Reyes opined that these tears were consistent with trauma. Nurse Reyes took swabs of the victim's mouth, anus, and vagina, which were provided to the police.

Trial Ct. Op., 10/5/16, at 2-4 (citations to the record omitted).

Appellant was arrested and taken to police headquarters, where, after being given **Miranda**[3] warnings, he provided a recorded interview. After the interview, police went to Ms. Zelaya-Betancourt's apartment and collected evidence, including the bloody wipes in the trashcan. The evidence gathered by Nurse Reyes and the police, together with a DNA swab from Appellant, was sent to the Pennsylvania State Police Crime Lab for testing and analysis. Trial Ct. Op. at 4.

Appellant was charged with rape of an unconscious victim, involuntary deviate sexual intercourse, sexual assault, two counts of aggravated indecent assault, and two counts of indecent assault. A jury was selected on April 5, 2016, and the evidentiary portion of Appellant's trial began on April 18, 2016. Trial Ct. Op. at 2. Prior to the evidentiary portion of the trial, the Commonwealth gave notice of its intent to play the recorded

_____

[3] **Miranda v. Arizona**, 384 U.S. 436 (1966).

- 3 -

interview Appellant had given to the police. Citing the Rape Shield Law, 18 Pa.C.S. § 3104,[4] the Commonwealth sought to redact references Appellant had made during the interview to Ms. Zelaya-Betancourt's alleged sexual encounter with another male the night before the incident in this case. Appellant objected to the redaction, and the court reserved ruling on the issue until more context was provided as the trial progressed. Trial Ct. Op. at 5.

Ms. Zelaya-Betancourt testified and was cross-examined about the statement she gave at the hospital; she confirmed that she had checked a box to indicate that she had not had consensual sex in the five days preceding the incident. Trial Ct. Op. at 3-4. The Commonwealth's DNA expert later testified that the DNA of three individuals – Appellant, Ms. Zelaya-Betancourt, and an unidentified person – was present on the wipes. Further, analysis of Ms. Zelaya-Betancourt's rectal swab did not reveal Appellant's DNA but did reveal male DNA that was not Appellant's. *Id.* at 4-5.

At the end of the first day of testimony, the trial court addressed whether Appellant's allegation that Ms. Zelaya-Betancourt had sex with another man the night before the incident should be redacted from Appellant's statement to the police. Appellant argued that the inconsistency

_____

[4] As discussed in greater detail later in this memorandum, the Rape Shield Law places limits on the admissibility of evidence regarding past sexual conduct of a sexual assault victim.

between Ms. Zelaya-Betancourt's assertion that she had not had sex in the five days preceding the incident and the DNA expert's testimony regarding the presence of a third person's DNA created an issue as to Ms. Zelaya-Betancourt's credibility. Trial Ct. Op. at 6. Appellant contended that this credibility issue allowed him to introduce the portion of his statement about Ms. Zelaya-Betancourt's prior sexual encounter, notwithstanding the prohibition in the Rape Shield Law. The trial court did not make a ruling at that time, and requested that the parties conduct additional research on the issue. The next morning, Appellant withdrew his objection to the redaction. The redacted version of the interview was played for the jury.

After the Commonwealth rested, Appellant called Arthur Young as a DNA expert. As the trial court explained:

> In large measure, Mr. Young agreed with the police analysts, including their conclusion that the bloody wipes most likely contained the DNA of [Appellant], the victim, and an unknown person. Mr. Young also agreed that the DNA analysis of the rectal swab revealed the presence of male DNA that was not contributed by [Appellant].

Trial Ct. Op. at 6-7 (citations to the record omitted).

Appellant then stated he would be recalling Ms. Zelaya-Betancourt, and the court held a sidebar. The Commonwealth asked for an offer of proof. Appellant responded that due to testimony regarding the DNA of a third person and Ms. Zelaya-Betancourt's statement that she had not had sex in the five days preceding the incident, "the credibility of a witness is now in play." N.T., 4/19/16, at 157. Appellant sought to ask Ms. Zelaya-

Betancourt why the DNA of a third person was found on the rectal swab. *Id.* at 156. The Commonwealth responded that Ms. Zelaya-Betancourt had already been asked whether she had sex in the five days preceding the incident; the presence of a third person's DNA did not mean that Ms. Zelaya-Betancourt had sex with the third person; Appellant's proposed line of questioning was prohibited by the substance of the Rape Shield Law; and Appellant failed to comply with the procedural requirements of the Rape Shield Law. *Id.* at 157-58.

The trial court ruled that Appellant could not ask Ms. Zelaya-Betancourt about having sex with anyone else, but could call Ms. Zelaya-Betancourt to testify regarding matters not covered by the Rape Shield Law. The court reasoned that (1) Appellant had not satisfied the procedural requirements of the Rape Shield Law by filing a timely written motion; and (2) credibility as a general concept did not trump the Rape Shield Law. N.T., 4/19/16, at 159-60. After the trial court announced its ruling, Appellant decided not to call Ms. Zelaya-Betancourt.

On April 20, 2016, the jury found Appellant guilty of two counts of indecent assault. The jury found Appellant not guilty of all other charges. On July 11, 2016, the trial court imposed a sentence of twelve to sixty months' incarceration. Appellant was classified as a Tier III sex offender under Section 9799.14(d)(16) of SORNA, which meant that he would be subject to a lifetime registration requirement. Section 9799.14(d)(16)

provides for a Tier III classification if an offender has had "[t]wo or more convictions of offenses listed as Tier I or Tier II sexual offenses." 42 Pa.C.S. § 9799.14(d)(16). On August 4, 2016, Appellant filed a timely notice of appeal.

In this appeal, Appellant raises the following issues, as stated in his brief:

> Does a trial court abuse its discretion under the 6[th] Amendment confrontation clause of [the] United States Constitution where [the] victim claims sexual assault of her rectum by [Appellant] and [a] rectal swab of [the] victim shows the presence of a male contributor not that of [A]ppellant and [A]ppellant wishes to question [the] victim as to her credibility and possible motive for bias?
>
> Whether [Appellant] is subject to Tier III lifetime Megan's Law[5] Registration.

Appellant's Brief at 5.

### Appellant's Confrontation Claim

Appellant first claims that the trial court abused its discretion by precluding him from questioning Ms. Zelaya-Betancourt regarding the alleged inconsistency between her statement that she had not had consensual sex in the five days preceding the incident and the presence of another person's DNA on her rectal swab. Appellant contends that this line of questioning related to Ms. Zelaya-Betancourt's credibility and was not precluded under the Rape Shield Law.

---

[5] "Megan's Law was the predecessor statute to SORNA." *Commonwealth v. Evans*, 138 A.3d 28, 30 n.3 (Pa. Super. 2016).

In **Commonwealth v. Burns**, we stated:

A trial court's ruling on the admissibility of evidence of the sexual history of a sexual abuse complainant will be reversed only where there has been a clear abuse of discretion. An abuse of discretion is not merely an error of judgment, but if in reaching a conclusion, the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill will, as shown by the evidence or the record, discretion is abused.

988 A.2d 684, 689 (Pa. Super. 2009) (*en banc*) (citations and quotation marks omitted), **appeal denied**, 8 A.3d 341 (Pa. 2010). Whether a defendant has been denied the right to confront a witness under the Confrontation Clause is a question of law which we review *de novo*. **See Commonwealth v. Yohe**, 79 A.3d 520, 530 (Pa. 2013), **cert. denied**, 134 S. Ct. 2662 (2014).

The trial court denied Appellant's request to question Ms. Zelaya-Betancourt in light of the Rape Shield Law, which provides:

**§ 3104. Evidence of victim's sexual conduct**

**(a) General rule.**—Evidence of specific instances of the alleged victim's past sexual conduct, opinion evidence of the alleged victim's past sexual conduct, and reputation evidence of the alleged victim's past sexual conduct shall not be admissible in prosecutions under this chapter except evidence of the alleged victim's past sexual conduct with the defendant where consent of the alleged victim is at issue and such evidence is otherwise admissible pursuant to the rules of evidence.

**(b) Evidentiary proceedings.**—A defendant who proposes to offer evidence of the alleged victim's past sexual conduct pursuant to subsection (a) shall file a written motion and offer of proof at the time of trial. If, at the time of trial, the court determines that the motion and offer of proof are sufficient on their faces, the court shall order an in camera hearing and shall

make findings on the record as to the relevance and admissibility of the proposed evidence pursuant to the standards set forth in subsection (a).

18 Pa.C.S. § 3104.  This Court has explained:

> The purpose of the Rape Shield Law is to prevent a trial from shifting its focus from the culpability of the accused toward the virtue and chastity of the victim.  The Rape Shield Law is intended to exclude irrelevant and abusive inquiries regarding prior sexual conduct of sexual assault complainants.

**Burns**, 988 A.2d at 689 (footnote and citations omitted).

With regard to the procedural requirements of the Rape Shield Law, "[w]e have repeatedly stated that a defendant who desires to introduce evidence of the victim's prior sexual conduct must file a written motion and make a specific offer of proof prior to trial.  We will presume that the legislature intended 'shall' to be mandatory in the statute at hand." **Burns**, 988 A.2d at 690-91 (citations omitted).

Substantively, "the Rape Shield law will bow to a defendant's right to confront and cross-examine when a specific proffer demonstrates that the proposed inquiry is intended to elicit relevant evidence, which is more probative than prejudicial, and which is not cumulative of other evidence available without encroaching upon Rape Shield Law protections." **Commonwealth v. Nieves**, 582 A.2d 341, 347 (Pa. Super. 1990), **appeal denied**, 600 A.2d 952 (Pa. 1991).  "If the offer of proof shows only that others in addition to the defendant had sexual contact with the victim, but does not show how the evidence would exonerate the defendant, evidence of

prior sexual activity is inadmissible under the Rape Shield Law."
***Commonwealth v. Fink***, 791 A.2d 1235, 1242-43 (Pa. Super. 2002)
(citations omitted).

After careful review of the parties' briefs, the record, and the opinion
by the Honorable Jonathan Mark, we conclude that Appellant's first issue
merits no relief. The trial court's opinion comprehensively discusses and
properly disposes of this issue. ***See*** Trial Ct. Op. at 12-15 (explaining (1)
Appellant failed to comply with the procedural requirements of the Rape
Shield Law; (2) "the evidence [Appellant] sought to introduce to address
credibility *was* heard by the jury, albeit without reference to the alleged
sexual encounter with a man the night before, through the testimony of the
victim and the reports and testimony of the experts"; and (3) Appellant's
general credibility argument was insufficient to trump the Rape Shield Law).
With respect to Appellant's claim that he was denied his constitutional right
to confront Ms. Zelaya-Betancourt through cross-examination, we note that
the trial court did not preclude Appellant from recalling Ms. Zelaya-
Betancourt as a witness. Rather, the court merely applied the Rape Shield
Law's restrictions on the admissibility of evidence of past sexual conduct in
limiting the questions that Appellant could ask if he questioned Ms. Zelaya-
Betancourt; Appellant was free to confront Ms. Zelaya-Betancourt through
other areas of questioning, but elected not to do so once the trial court
made clear that his questioning had to conform to the Rape Shield Law's

requirements. Enforcement of rules regarding the admissibility of evidence is not a violation of the constitutional right to confront witnesses. **See Commonwealth v. Quartman**, 458 A.2d 994, 996 (Pa. Super. 1983) ("The fundamental right to confront witnesses often gives way . . . to certain evidentiary principles."). Appellant therefore is not entitled to relief on this issue.

### SORNA Registration Period

In his second issue, Appellant argues that, in light of recent guidance from the Supreme Court of Pennsylvania, he should be classified as a Tier II offender, rather than a Tier III offender, under SORNA. The Commonwealth and the trial court both agree with Appellant's position. **See** Trial Ct. Op. at 15-17; Commonwealth's Brief at 9.

We also agree. The Pennsylvania Supreme Court's decision in **Commonwealth v. Lutz–Morrison**, 143 A.3d 891 (Pa. 2016), was issued on August 15, 2016, after the trial court in this case classified Appellant as a Tier III offender. The Supreme Court in **Lutz–Morrison** held that Section 9799.14(d)(16) of SORNA "requires an act, a conviction, and a subsequent act to trigger lifetime registration for multiple offenses otherwise subject to a fifteen- or twenty-five-year period of registration." **Lutz–Morrison**, 143 A.3d at 895 (citation omitted). Appellant was convicted of two counts of indecent assault in this case, but his conduct did not involve an act, a conviction, and a subsequent act within the meaning of **Lutz-Morrison**. As

- 11 -

the trial court explained, Appellant's "Indecent Assault convictions arose from a single act that was [Appellant]'s initial act for registration purposes. Accordingly we agree that [Appellant] is not subject to lifetime registration under SORNA." Trial Ct. Op. at 16.

The most serious crime of which Appellant was convicted was indecent assault of an unconscious person, 18 Pa.C.S. § 3126(a)(4), a Tier II offense. **See** Trial Ct. Op. at 16; 42 Pa.C.S. § 9799.14(c)(1.3). Appellant's registration period should therefore be twenty-five years. **See** Trial Ct. Op. at 16; 42 Pa.C.S. § 9799.15(a)(2). Accordingly, with the benefit of the Supreme Court's recent statutory construction, and because the Commonwealth also conceded Appellant is due relief, we vacate the lifetime registration portion of Appellant's sentence and remand for imposition of a twenty-five year registration requirement under SORNA.

In sum, we vacate the lifetime registration portion of Appellant's sentence and remand for imposition of a twenty-five year registration requirement under SORNA. In all other respects, Appellant's judgment of sentence is affirmed. Because we affirm in part based on the trial court's opinion, the parties are instructed to attach a copy of the trial court's October 5, 2016 opinion to any future filing referencing this Court's decision.

Affirmed in part, vacated in part. Jurisdiction relinquished.

President Judge Emeritus Stevens joins the memorandum.
Judge Lazarus notes dissent.

- 12 -

Judgment Entered.

_____

Joseph D. Seletyn, Esq.
Prothonotary


Date: 9/11/2017

COURT OF COMMON PLEAS OF MONROE COUNTY
FORTY-THIRD JUDICIAL DISTRICT
COMMONWEALTH OF PENNSYLVANIA

COMMONWEALTH OF PENNSYLVANIA

                 v.

ALLEN NEAL, JR,
          Defendant

           :    **NO. 225 CRIMINAL 2015**
           :
           :    **APPEAL DOCKET NO.**
           :    **2462 EDA 2016**

## OPINION IN SUPPORT OF ORDER PURSUANT TO Pa. R.A.P. 1925(a)

Defendant filed an appeal from the judgment of sentence ordering him to serve one to five years' imprisonment and classifying him as a Tier III sexual offender based on his jury trial conviction of two counts of Indecent Assault. On appeal, Defendant alleges that we erred by: 1) "denying him the ability" to recall the victim on his side of the case; and 2) classifying him as a Tier III sexual offender under the Sexual Offender Registration and Notification Act (SORNA), 42 Pa. C.S.A. §9799.10 *et. seq*. Regarding the offender classification, Defendant suggests that if the conviction is upheld he should be classified as a "Tier-I offender subject to ten year registration."

For the following reasons, Defendant's first assignment of error lacks merit. As to the sex offender classification claim, we agree that the intervening change in the law referenced in Defendant's Rule 1925(b) statement requires that Defendant be reclassified. However, he should be reclassified as a Tier II twenty-five year registrant rather than as a Tier I offender.

1

## BACKGROUND

Defendant was arrested and charged with Rape of an unconscious person, Involuntary Deviate Sexual Intercourse with an unconscious person, Sexual Assault, Aggravated Indecent Assault of an unconscious person, Aggravated Indecent Assault without consent, Indecent Assault of an unconscious person, and Indecent assault without consent. A jury was selected on April 5, 2016. The evidentiary portion of trial commenced on April 18, 2016. On April 20, 2016, the jury convicted Defendant of Indecent Assault of an unconscious person and Indecent Assault without consent. Defendant was acquitted of the other charges.

The facts and procedural history relevant to Defendant's first assignment of error were brought out during trial. In summary:

Defendant and the victim, Karina Zelaya-Betancourt, had been best friends for approximately six or seven years prior to this incident, which occurred in the early morning hours on December 14, 2014. Following a night out, Defendant, the victim, and several friends went to the victim's apartment to continue the party. As the party died down, most of the guests left until only Defendant, the victim, and the victim's friend, Amanda Belen, remained. The victim went to sleep in her daughter's bedroom because Ms. Belen had already gone to sleep in her room. Defendant, after checking in on the victim, went to sleep on the living room couch. (N.T. 4/18/2016, pp. 64-65).

At approximately 8:00 a.m., the victim was awoken by a "pain anally and I saw [Defendant] over me and I just told him to get off of me." *Id.* She testified that she had been sleeping on her stomach and that her pajama pants and underwear had been pulled down. Defendant was mostly clothed but the victim "saw him like tuck himself

2

back in before he got off of me" and "walked to the living room." (N.T., 4/18/2016, pp. 65-66). On cross-examination, the victim conceded that she did not actually see Defendant's penis. (N.T., 4/18/2016, p. 111).

Following the assault, the victim felt wetness on her buttocks area. She went into the bathroom, wiped the area with baby wipes, and discovered that she was bleeding from her anus. Some of the bloody wipes were flushed down the toilet, but several others were thrown into the trashcan. The wipes in the trashcan were later recovered by investigators.

After wiping herself off, the victim went into her bedroom, where Amanda Belen had been sleeping until she was awoken after hearing the victim yell at Defendant. The victim then called another friend, who lived close by and had been present the night before, to escort Defendant out of the apartment. (N.T., 4/18/2016, pp. 66-70). Defendant complied without incident.

Subsequently, the victim was taken to Pocono Medical Center and the police were called. At the hospital, the victim was examined by Rose Reyes, R.N., a Sexual Assault Nurse Examiner (SANE). During the examination, the victim provided a statement to Nurse Reyes and Detective Robert Miller of the Pocono Mountain Regional Police Department (PMRPD). (N.T., 4/18/2016, p. 70).

Nurse Reyes, who qualified as an expert SANE nurse, testified that, at the beginning of the examination, the victim was crying and recounted the facts summarized above. During the interview portion of the examination, the victim completed a questionnaire, which asked various questions, including one central to this appeal: whether the victim had consensual sex in the previous five days. On the

3

questionnaire, the victim responded that she had not. (N.T., 4/18/2016, p. 119). On cross-examination, defense counsel went over the form with the victim, and the victim confirmed that she had checked the box accordingly. *Id.*

During her physical examination of the victim, Nurse Reyes discovered "tearing in the anal area. It was mostly toward the 5 and 8 o'clock area. There was tiny little skin tears with a little tiny bit of bleeding more so to the 5:00 and 6:00 area." (N.T., 4/18/2016, p. 161). Nurse Reyes opined that these tears were consistent with trauma. (N.T., 4/18/2016, p. 171). Nurse Reyes took swabs of the victim's mouth, anus, and vagina, which were provided to the police.

After the SANE examination was completed, Defendant was arrested and taken to PMRPD headquarters, where he was *Mirandized* and questioned by Detective Miller in a recorded interview. (N.T., 4/19/2016, pp. 6-18). After conducting the interview, Detective Miller and several PMRPD officers went to the victim's residence to collect evidence. They took photographs of the bedroom and the trashcan, gathered several items of clothing, and collected the bloody wipes from the trashcan. (N.T., 4/19/2016, pp. 18-21).

The evidence gathered by Nurse Reyes and the police, together with a buccal DNA swab of Defendant, was sent to the Pennsylvania State Police Crime Lab for testing and analysis. At trial, the Commonwealth called a serologist and a forensic DNA analyst from the Crime Lab to testify about their analyses and testing of the evidence.

For clarity's sake, the rectal swab and the bloody wipes are the pieces of evidence that are relevant to this appeal. The DNA analyst testified that the DNA of three individuals – the victim, Defendant, and an unidentified person – was found on the

4

wipes. Specifically, he stated that testing of the wipes revealed "[a] partial DNA profile that was consistent with a mixture of at least three individuals [] [] from the non-sperm portion of the tissue." (N.T., 4/18/2016, p. 216). As to the likelihood that the DNA found on the wipes came from the victim and Defendant, the analyst stated:

> [t]he results that I obtained stated that it was 4.7 tredecillion times more likely in the Caucasian population, 120 duodecillion times more likely in the African American population and 19 duodecillion times more likely in the Hispanic population that [the victim] and [Defendant's] DNA was present in this mixture than not.

(N.T., 4/18/2016, p. 219).

The DNA analyst also performed a DNA analysis on the victim's rectal swab, which revealed the presence of male DNA. However, the DNA did not belong to Defendant. (N.T., 4/18/2016, p. 224).

After the Crime Lab analysis testified, a redacted version of the recorded interview Detective Miller conducted with Defendant was played. Redaction occurred after consultation between the Court and counsel for both parties which included discussion of Rape Shield Law issues that are the same as, or at least similar to, the issues implicated by Defendant's first assignment of error.

Prior to the evidentiary portion of trial, the Commonwealth gave notice that it intended to play the recorded interview. However, citing the Rape Shield Law, 18 Pa.C.S.A. Section 3104, the Commonwealth sought to redact references made by Defendant to the victim's alleged sexual encounter with an unknown male the night before the incident that gave rise to this case. Defendant objected to redaction and we reserved ruling on the issue until more context was provided as the trial unfolded and developed.

5

After the first day of trial, we discussed the issue with the parties on the record after the jury had been excused. Defense counsel argued that

> So you know now we have this statement where no – and yet we have this evidence that came in today from the Commonwealth's witnesses; it wasn't my evidence Your Honor it was their evidence okay which said that their swab – their DNA swab was – three people on there. Not just [Defendant] but [the victim] and also a third so I think it goes to the credibility as to what's on that DNA swab and whether or not she had relations the night before.

(N.T., 4/18/2016, p. 244). We expressed an initial belief that the evidence would be inadmissible under the Rape Shield Law, but instructed the parties to research and be prepared to argue the issue in more detail the next morning to assist us in making a final ruling. However, the following morning, defense counsel withdrew his objection with respect to redacting this portion of the transcript. (N.T., 4/19/2016, p. 4). Accordingly, the redacted version of the recording was played.

After the Commonwealth rested, Defendant called Arthur Young, a scientist who qualified as an expert in the fields of serology, forensic DNA analysis, and Y-STR analysis. Prior to trial, Mr. Young reviewed the reports generated by the serologist and the forensic DNA analyst from the Pennsylvania State Police. Additionally, he was present and heard the majority of the trial testimony. He testified in detail regarding serology and DNA analyses, the reports prepared by the State Police serologist and DNA analyst, the tests used by the police, and how the tests can produce false positives. In large measure, Mr. Young agreed with the police analysts, including their conclusion that the bloody wipes most likely contained the DNA of Defendant, the victim, and an unknown person. Mr. Young also agreed that the DNA analysis of the

6

rectal swab revealed the presence of male DNA that was not contributed by Defendant. (N.T., 4/19/2016, pp. 103-04,108-09).

Counsel for Defendant then announced that he would be recalling the victim. At that point, the Commonwealth asked for and was granted a sidebar outside of the jury's hearing. After a very lengthy discussion, we ruled that Defendant could recall the victim but would not be permitted to question her regarding the alleged sexual encounter with the unknown male, as this evidence was prohibited by the Rape Shield Law. (N.T., 4/19/2016, pp. 155-71). It is this ruling that forms the basis of Defendant's first assignment of error.

During the sidebar, the Commonwealth asked for an offer of proof as to why Defendant wanted to recall the victim. Defendant's attorney responded that:

> Our offer of proof is that we're calling [the victim] because we believe that there is a serious question as to credibility regarding this third person. We think we've established that there is a third person. We've established it not only in the first set of DNA swabs that were submitted to the crime [lab]; but also to the second set of DNA swabs that were submitted to the crime lab. So there is a third person.
>
> In the first set of DNA swabs for the rectal we have a male, an unidentified male and that came from the rectal swab. So we believe at this particular point – and we're going to call her and question her regarding as to why that is the case.
>
> I think it goes to her credibility. She testified under oath that she didn't have any other relations for five days preceding, okay; and although the district attorney might want to characterize this as Rape Shield I did look up the law last night and I do believe that the credibility of a witness is now in play and I think we've established certainly prima facie evidence that there is a third person that's been involved in this woman's life and I don't believe she told the truth.

(N.T., 4/19/2016, pp. 156-57). The assistant district attorney argued that the question of whether or not the victim had had sex in the previous five days had been asked and

7

answered, that the presence of DNA on the rectal swab did not mean that semen was present, and that such questioning is prohibited by the Rape Shield Law. Additionally, he pointed out that the Rape Shield law has notice requirements which were not met in this case. (N.T., 4/19/2016, pp.157-58).

After hearing the arguments of both attorneys and noting that this issue should have been raised earlier, either pretrial or during the morning when we had set aside time to hear argument on redaction of the recording and application of the Rape Shield Law, we articulated the reasons for our ruling:

> Well, here's the thing; procedurally I still think if you want to get into Rape Shield then there is a procedural component to this and I indicated yesterday both before and after the cross-examination you're talking about that the procedure hadn't been met and it still hasn't been. There's no written motion and no timely motion.
>
> Second, with respect to credibility, I think it's pretty clear that in general you can properly ask a witness questions that would go to credibility and judging the veracity of his or her testimony; however, in the context of Rape Shield just credibility by itself I have to disagree with [Defendant]. As a general concept it doesn't trump the Rape Shield Law. It has to be something with respect to motive, bias, those types of things.
>
> So had there been any indication for example that [the victim's] boyfriend came back from Vegas early and saw [Defendant] in the place and that she might have cried rape because she got caught with someone else in her house; that might be a whole different story. Then you have the constitutional issues and you have her credibility, etc.; but just to say that I want to ask her about something that has to do with sex because she just said she didn't have it; that's just a back door attempt around the Rape Shield law and that's not required as far as the cases I've seen.
>
> Having said all that, I'm not sure I can necessarily preclude the witness because I think there are questions that can legitimately be asked that might not implicate the Rape Shield Law; but if you're asking me if you can ask her if she had – to talk about sex or someone else having sex, absolutely not.

8

(N.T., 4/19/2016, pp.159-60).

We subsequently gave counsel for Defendant the opportunity to refine his offer of proof, his arguments, and the scope of the questions he wanted to ask and the subjects about which he wanted to inquire. For reasons stated on the record, we did not modify our ruling. (N.T., 4/19/2016, pp. 160-71).

Defendant and his attorney ultimately elected not to recall the victim.[1] Instead, on the third morning of trial, after several defense exhibits that were admitted, the defense rested. The jury then found Defendant guilty of two counts of Indecent Assault.

On July 11, 2016, we sentenced Defendant to incarceration of twelve to sixty months. In accordance with the holding and rationale of our Superior Court in *Commonwealth v. Merolla*, 909 A.2d 337 (Pa. Super. 2006), which we determined was at the time the controlling precedent, we classified Defendant as a Tier III sex offender and required that he register under SORNA for life. As noted, Defendant's second assignment of error takes issue with the SORNA classification.

## DISCUSION

1. Defendant's First Assignment of Error Lacks Merit as the Court Did Not Improperly Preclude Defendant from Recalling the Victim

In his first assignment of error, Defendant alleges that:

the trial court abused its discretion AND committed reversible error when it denied [Defendant] the ability to recall the victim in this matter after the Commonwealth rested, AND appellant laid an

---

[1] After the victim testified at trial, the Commonwealth asked that she be excused. Counsel for Defendant objected and indicated that the victim was under his subpoena as well as the Commonwealth's. We told the victim that she was not excused from her subpoenas. We allowed the victim to leave the Courtroom and the Courthouse, but instructed that she must provide contact information and be available on relatively short notice for recall. (N.T., 4/18/2016, p. 140). Thus, the victim was available for recall.

9

evidentiary foundation, wherein, the victim's credibility was at issue regarding the physical location of her claimed assault:

Victim claimed she woke up bleeding from her anus. DNA evidence provided by the Commonwealth demonstrated that male DNA was not [Defendant's]. Rather, the 'rectal swab taken from the victim's anus during her rape examination demonstrated that the DNA located on the swab was another male's DNA. Denial of [Defendant] to to [sic] question the victim as to her credibility as to this vital and material point was an abuse of discretion by the trial court judge becaue [sic] it denied Defendant his right to confrontation under Article 1 Section 9 of the Pennsylvania Constitution and 6th Amendment of the United States Constitution's confrontation clause, and thereby denied [Defendant] of a fair trial AND liberty without due process of law under the Fourteenth Amendment of the United States Constitution.

(Defendant's 1925(b) Statement, filed 8/25/2016). Put simply, and reading this assignment of error to include omitted references, Defendant believes that he should have had the opportunity to question the victim as to why another male's DNA was found on the rectal swab if, as indicated on a hospital form, she had not had consensual sex within the previous five day -- another attempt to delve into her alleged encounter with a man the night before the incident. Defendant's belief and the assignment of error to which the belief gave rise lack merit.

The Rape Shield Law provides, in pertinent part:

(a) General rule. -- Evidence of specific instances of the alleged victim's past sexual conduct, opinion evidence of the alleged victim's past sexual conduct, and reputation evidence of the alleged victim's past sexual conduct shall not be admissible in prosecutions under this chapter except evidence of the alleged victim's past sexual conduct with the defendant where consent of the alleged victim is at issue and such evidence is otherwise admissible pursuant to the rules of evidence.

(b) Evidentiary proceedings. -- A defendant who proposes to offer evidence of the alleged victim's past sexual conduct pursuant to subsection (a) shall file a written motion and offer of proof at the time of trial. If, at the time of trial, the court determines that the

10

motion and offer of proof are sufficient on their faces, the court shall order an in camera hearing and shall make findings on the record as to the relevance and admissibility of the proposed evidence pursuant to the standards set forth in subsection (a).

18 Pa.C.S.A. § 3104.

The bar to evidence of a victim's past sexual conduct is not absolute and is subject to certain statutory and constitutional exceptions. The lone statutory exception, included in the language of Section 3104(a), allows evidence of the victim's past sexual conduct *with the defendant* when *consent of the victim* is at issue. That exception is clearly not applicable to this case. *See Commonwealth v. Allburn*, 721 A.2d 363, 367 (Pa. Super. 1998).

With respect to the constitutional exceptions, our Supreme Court has held the law does not prohibit relevant evidence that "directly negates the act of intercourse with which a defendant is charged." *Commonwealth v. Majorana*, 470 A.2d 80, 84 (Pa. 1983). *See also Commonwealth v. Widmer*, 667 A.2d 215, 216 (Pa. Super. 1995). The Rape Shield Law may not be used to exclude relevant evidence showing a witness' bias or attacking credibility. *Commonwealth v. Black*, 487 A.2d 396, 401 (Pa. Super. 1985). "Evidence tending to directly exculpate the accused by showing that the alleged victim is biased and thus has a motive to lie, fabricate, or seek retribution is admissible at trial." *Commonwealth v. Guy*, 686 A.2d 397, 400 (Pa. Super. 1996). If the offer of proof only shows that others in addition to the defendant had sexual contact with the victim, but does not show how the evidence would exonerate the defendant, evidence of prior sexual activity is inadmissible under the Rape Shield Law. *Commonwealth v. Fink*, 791 A.2d 1235, (Pa. Super. 2002); *Commonwealth v. Durst*, 559 A.2d 504 (Pa. 1989).

11

In sexual assault cases, trial courts are frequently called upon to interpret and apply the Rape Shield Law. Rulings on the admissibility of evidence of the sexual history of a sexual assault complainant will be reversed only where there has been a clear abuse of discretion. *Commonwealth v. Allburn*, 721 A.2d 363, 366 (Pa. Super. 1998). An abuse of discretion is not merely an error of judgment. *Id.* An abuse of discretion occurs where the record shows that the trial court, in reaching a conclusion, overrides or misapplies the law, or exercises its judgment in a manifestly unreasonable manner or as the result of partiality, prejudice, bias, or ill will. *Id.*

In this case, we orally summarized our reasons for issuing the challenged ruling on the record. (N.T. 4/19/2016, pp.159-60 and 160-71). We incorporate our on-record statements into this opinion by reference. For the most part, the rationale we previously articulated suffices to address Defendant's first assignment of error and to demonstrate that our ruling was not an abuse of discretion. To what we said before, we add the law cited above and the following:

First, Defendant's assignment of error is inaccurate and misleading. We did not, as the assignment implies, preclude Defendant from recalling the victim. On the contrary, our ruling was quite clear that Defendant would be permitted to recall the victim, but that the subject matter about which he would be permitted to inquire would be limited in accordance with the Rape Shield Law. (N.T. 4/19/2016, pp.159-60).

Second, Defendant's attempt to delve into areas limited or precluded by the Rape Shield Law was procedurally defective. Under Section 3104(b), Defendant was required to file a *written* motion in addition to the offer of proof. When Defendant made his oral motion at trial, we indicated that this procedural prerequisite had not been met.

12

(N.T. 4/19/2016, pp. 159-60). By itself, this failure is fatal to Defendant's claim. See *Commonwealth v. Beltz*, 829 A.2d 680, 684 (Pa. Super. 2003). This is especially true in this case since Defendant and his attorney became aware of the information needed to file the required motion – presence of the DNA of an unknown male on the rectal swab, the victim's answer on the SANE questionnaire regarding consensual sexual activity, and Defendant's assertion that the victim had sexual contact with a man the night before – through documents provided in discovery, expert reports, and Defendant's personal observations and knowledge long before trial. Simply, Defendant had ample opportunity to file a timely written motion. He did not.

Third, the evidence Defendant sought to introduce to address credibility was heard by the jury, albeit without reference to the alleged sexual encounter with a man the night before, through the testimony of the victim and the reports and testimony of the experts. Specifically, the jury heard the victim's denial of sexual activity within the previous five days and about the presence of an unknown male's DNA on the rectal swab. Our ruling did not preclude Defendant from eliciting or arguing this evidence or using it to attack the victim's credibility. In fact, in his closing, counsel for Defendant highlighted and argued this evidence. (N.T., 4/20/2016, pp. 16-17).

Fourth, Defendant's sole reason for recalling the victim was his belief that her general credibility had been called into question based on the response she provided on the questionnaire. According to Defendant, this "credibility issue" constitutes an exception to the Rape Shield Law. However, numerous cases have held that such evidence, asserting that others in addition to Defendant had sexual contact with victim, is inadmissible and not relevant. See *Durst*, 559 A.2d at 506 ("Inasmuch as Appellee's

13

offer of proof tends only to show that others *in addition* to Appellee had sexual contact with the victim rather than showing how this testimony would exonerate him, Appellee has not satisfied his burden of showing that the absent testimony would have been helpful in establishing his innocence."). *See also Commonwealth v. Reefer*, 573 A.2d 1153, 1154 (Pa. Super. 1990) (holding that such evidence is properly excluded on grounds of relevancy).

Finally, along similar lines, as we noted on the record, Defendant's offer of proof did not allege or contain any indication that the victim had motive to lie or bias that was specific to Defendant. Without a more specific proffer, defendant's general credibility argument is simply not enough to trump the Rape Shield Law. In this regard, a quick reading of *Black* could lead to the belief that a victim's past sexual conduct may be admissible if it brings credibility into question. However, subsequent appellate cases clarify and teach that a general credibility attack is simply not enough to trump the Rape Shield Law. In this regard, the Superior Court has clarified that inquiries attacking the victim's credibility are sufficient to pierce the Rape Shield Law "only where the victim's credibility was allegedly affected by bias against or hostility toward the defendant, or the victim had a motive to seek retribution." *Commonwealth v. Boyles*, 595 A.2d 1180 (Pa. Super. 1991); Compare *Commonwealth v. Frank*, 577 A.2d 609, 620 (Pa. Super. 1990) and *Commonwealth v. Erie*, 521 A.2d 464, 467–69 (Pa. Super. 1987), *allocatur denied*, 538 A.2d 875 (1988) (following *Black*) with *Commonwealth v. Reefer*, 573 A.2d 1153, 1154 (Pa. Super. 1990) and *Commonwealth v. Nenninger*, 519 A.2d 433, 437 (Pa. Super. 1986) and *Commonwealth v. Dear*, 492 A.2d 714, 719–20 (Pa. Super. 1985) and *Commonwealth v. Coia*, 492 A.2d 1159, 1161 (Pa. Super. 1985) (distinguishing *Black*).

14

In *Reefer*, for example, the appellant sought to introduce witness testimony regarding the prior sexual conduct of the victim (and of her mother) for impeachment purposes. In addition to finding the proffered testimony irrelevant, the court noted the appellant's failure to "connect the alleged sexual activity involving the excluded defense witnesses with a motive for hostility by the victim, or his mother, against him." *Reefer* supra at 1154. The court went on to contrast *Reefer* with *Black*, a case in which the excluded evidence "concerned the defendant's ability to cross-examine the prosecutrix/victim about her incestuous relationship with her brother, who had been driven from the home for that reason by the defendant." *Id.* In *Black*, this evidence was admissible but it is clear that the proffer in that case laid a foundation for bias and motive. Here, Defendant's offer of proof did not allege or contain any indication that the victim had a specific motive to lie or bias towards Defendant. Without a more specific proffer, Defendant's general credibility argument was simply insufficient to trump the Rape Shield Law.

2.   <u>Defendant Should Be Classified as a Tier II Offender and Required to Register Under SORNA for Twenty-Five Years</u>

As noted, we classified Defendant as a Tier III sex offender in accordance with *Commonwealth v. Merolla, supra*, the controlling authority at the time, which held that an offender who is convicted of multiple index sex offenses in a single incident and case is required to register as a sex offender for life. However, the Pennsylvania Supreme Court subsequently decided *Commonwealth v. Lutz-Morrison*, 143 A.3d 891 (Pa. 2016) and *A.S. v. Pa. State Police*, 143 A.3d 896 (Pa. 2016) which changed the law. Specifically, the Supreme Court clarified that, "the statute [42 Pa. C.S.A. §9799.14(d)(16)] requires an act, a conviction, and a subsequent act to trigger lifetime

15

registration for multiple offenses otherwise subject to a fifteen- or twenty-five-year period of registration." *Lutz-Morrison*, 143 A.3d at ___.

In this case, the Indecent Assault convictions arose from a single act that was Defendant's initial act for registration purposes. Accordingly, we agree that Defendant is not subject to lifetime registration under SORNA. However, we disagree with Defendant's contention that he should be classified as a "Tier-I offender subject to ten year registration." (Defendant's Rule 1925(b) Statement, filed August 25, 2016, p. 2).[2]

SORNA contains a system in which the crimes that are subject to registration requirements are divided into three tiers. 42 Pa. C.S.A. § 9799.14. Persons convicted of a Tier I, II, or III offense are subject to SORNA's registration requirements for fifteen years, twenty-five years, and life, respectively. 42 Pa C.S.A. §9799.15. Defendant was convicted of Indecent Assault without consent under 18 Pa. C.S.A. §3126(a)(1) and Indecent Assault of an unconscious person under 18 Pa. C.S.A. §3126(a)(4). Indecent Assault under sub-section (a)(1) is a Tier I offense. However, Indecent Assault under sub-section (a)(4) is a Tier II offense. 42 Pa.C.S.A. § 9799.14(c)(1.3). Accordingly, we believe that Defendant should be reclassified as a Tier II offender and required to register and report under SORNA for twenty-five years. 42 Pa.C.S.A. § 9799.15(a)(2).

In spite of reaching this conclusion, we do not believe we can at this time amend the judgment of sentence to reclassify Defendant. Specifically, we believe that this appeal divests us of jurisdiction to make the change. See Pa.R.A.P. 1701(a) and 1701(b)(3); see also *Commonwealth v. Tabb*, 207 A.2d 884 (Pa. 1965). If the judgment of sentence is affirmed, and if the Superior Court agrees that Defendant is entitled to be reclassified

---

[2] Under SORNA, the fourth version of Megan's Law in Pennsylvania, there is no ten year registration period. The ten year registration requested in Defendant's Rule 1925(b) statement is apparently a reference to the third iteration of Megan's Law, which did include a ten year period for some index crimes, that SORNA repealed and replaced.

16

as a Tier II offender, we will amend the judgement of sentence once the appeal is decided and all appellate courts relinquish jurisdiction.

In sum, for the reasons stated on the record during trial as well as those articulated in this opinion, the challenged evidentiary ruling was proper under the facts and the law. Therefore, Defendant's first assignment of error lacks merit. However, due to the intervening change in the law, Defendant should be reclassified as a Tier II offender. Accordingly, we believe that the convictions should be affirmed, the classification of Defendant as a Tier III offender should be reversed, and the case should be remanded for the entry of an order reclassifying Defendant as a Tier II offender subject to SORNA registration for twenty-five years.

BY THE COURT:

**DATE:** October 4, 2016

JONATHAN MARK, J.

cc:  Superior Court of Pennsylvania
Jonathan Mark, J.
Bradley Weidenbaum, Esq.
District Attorney

2016 OCT 5 AM 11 06
MONROE COUNTY, PA
CLERK OF COURTS

17